[No. 2802.]

P. S. NOLEN *v.* THE STATE.

1. PRACTICE—CONTINUANCE.—When it appears from the evidence that the material facts alleged to be provable by the absent witnesses were within the knowledge of other accessible witnesses, the action of the trial court in refusing a continuance cannot be held error, when it worked no prejudice to the accused.

2. PRACTICE—EVIDENCE.—When essential to the due administration of justice, it is within the discretion of the trial judge to receive evidence at any stage of the trial before the conclusion of argument.

3. CONFESSIONS—CASE OVERRULED.—Where the confessions of a defendant under arrest are inadmissible against him because made while he was uncautioned, his acts, if tantamount to such a confession, and done under similar circumstances, are likewise inadmissible. The case of *Rhodes* v. *The State,* 11 Texas Court of Appeals, 563, overruled on this subject. See the opinion *in extenso* on the question.

4. SAME—CASE STATED.—The State, over the objection of the defense, was permitted to prove in a trial for murder that, two or three days after his arrest, and while under arrest, the defendant was taken to the place of the homicide, and asked what he had done with the body of the deceased, in reply to which question he pointed to a hill where the body had been previously found. *Held,* inadmissible. See the opinion *in extenso* on the question.

5. SAME—CONFESSIONS MADE UNDER ARREST.—Statements of facts or circumstances which are already known to exist, and which statements do not lead to any information connecting or tending to connect the defendant with the crime, will not be admissible in evidence against the defendant if made while under arrest, unless they be made admissible under some other exception in the statute. See the opinion *in extenso* on the subject.

6. MURDER—FACT CASE.—See evidence held insufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Medina. Tried below before the Hon. T. M. Paschal.

The indictment charged the appellant with the murder of Sandy Winn, on April 6, 1879. The conviction was for murder of the second degree, and the punishment awarded was a term of twelve years in the penitentiary.

Ben. White was the first witness introduced by the State. He testified, in substance, that on the morning of April 7, 1879, he was informed of the discovery of traces of a "drag" in his neighborhood, in Medina county. He went to the place indicated, and found an abandoned camp, which had been occupied by a party of men with a wagon. Investigation disclosed a pool of blood near where the wagon had stood. It had been covered with dirt, evidently with the view of hiding it. A "drag" of some heavy body or object led off from the blood spot. The witness and his companions followed this drag a distance of about five hundred yards up a rocky, brushy hill, and found the dead body of a man lying face downwards with the feet up and the head down the hill. Examination disclosed that the head from the ears forward had been crushed by a blow from some heavy instrument. All appearances indicated that the body had been dragged to the spot feet foremost. The clothing had been torn by the brush and drawn up on the body. The "drag" led back from where the body was found to where the wagon stood. It was evident that it had been dragged by two horses, of which one was shod all round. From the body the witness and his party followed the tracks over the brow of the hill and around its base, back in the direction of the camp. The trail of the wagon and of a number of horses led off in a southeasterly direction. The trail of the wagon indicated that the hind wheel on one side did not follow directly in the track of the front wheel, and this peculiarity was sufficiently marked to enable any one to follow the trail readily. The places where both the camp and the body were found are in Medina county, near the Uvalde county line, about two and a half miles southeast of the residence of Sam. Johnson.

Henry Shane, the next witness for the State, corroborated the testimony of White as to the appearance of the camp and body, and testified in addition that, in company with Sergeant Caruthers of the State force, he followed the trail of the wagon and horses from the camp where the blood was discovered in a southeasterly direction to the house of Jeff. Johnson, where the wagon had evidently stopped. Thence he followed the trail to a point near the residence of Captain Toms, in Wilson county,

where he and Caruthers found the wagon and a bunch of horses in the possession of one Ed. Swift. The horses and wagon were the property of the defendant, or were claimed to be. Thence the witness and Caruthers went to the residence of John Camp, on the San Antonio river near Floresville, where they found the defendant on the gallery. He had slept there all night, and was pulling on his boots when witness and Caruthers arrested him. This was between daylight and sunrise. From here, which was some ninety miles distant, the witness and Caruthers took the defendant to the camp where the blood was found. The defendant, who was under arrest, manifested great emotion when the camp was reached, the tears running down his cheeks. The wagon was a home made vehicle. One wheel did not track accurately, and the trail was easily followed. Witness saw this wagon a few days before the killing. It was then at the defendant's camp. The defendant, deceased and Ed. Swift were then with it.

Sam. Johnson testified, for the State, that in the early part of the year 1879, the defendant passed his house with a herd of horses and cattle, going northwest, and the witness believed that the deceased was with him at that time. About April 1, thereafter, the defendant, in company with the deceased and Ed. Swift, returned to the witness's neighborhood with a wagon and twelve or thirteen head of horses and mules, camping in the neighborhood for a week or two, during which time the defendant went to Nueces cañon, in Uvalde county. Before going to the cañon, the defendant came to the witness and requested the loan of sixty or seventy dollars, which he said he owed the deceased and was anxious to pay, as the deceased, who wanted to go to Fort Clark, was annoying him about it. He proposed to transfer horses to the witness to raise the money. Witness had never heard the defendant speak unkindly of the deceased.

The defendant came to the witness's house on the morning of April 7, 1879, with Ed. Swift, who was driving his wagon, and asked witness to guide him to the road leading to Jeff. Johnson's neighborhood. The witness sent Danzer, a man in his employ, to guide defendant and Swift as requested, and to drive up a yoke of oxen on his return. The deceased was not then with the defendant. Witness rode off after giving Danzer directions, and seeing him saddle his horse to go with defendant and Swift. This witness corroborated Shane and White as to the finding of the body and camp and the appearance of each. The body of

the deceased was found about three miles southeast of the residence of the witness, in the direction of Jeff. Johnson's, on the evening after the defendant passed the witness's house going eastward.

On cross-examination, the witness stated that Danzer returned home late in the evening, stating that he had been hunting oxen. This man Danzer had been working for the witness about a month, and, the witness thought, was unacquainted with the defendant. Their actions did not indicate an acquaintance. In a day or two after the discovery of the body Danzer, without giving notice, quit the employment of the witness and left the country, riding a gray pony which he owned, since which time he has never been seen or heard of. Danzer owned a rifle, but no pistol. The witness had often seen the deceased about the neighborhood. He invariably carried a pistol, and generally rode a small blue mare. Danzer was a loose character, and was liable to quit working for a man at any time.

Jeff. Johnson testified, for the State, that he lived about twenty miles southeast of Sam. Johnson, on the road leading from Sam. Johnson's to Camp's place, near Floresville, in Wilson county. About the time of the murder of the deceased, in April, 1879, two men, with a wagon and a herd of twelve or thirteen horses and mules, camped near the house of the witness. They came late in the evening, and left next morning about sunrise. Two days later, Henry Shane came by the witness's house in pursuit of a party with a wagon and bunch of horses and mules. The witness did not know the campers.

George Stokeley, for the State, testified that he had seen the deceased in the employ of the defendant. On or about the fifth day of April, 1879, the defendant sold a stock of cattle to witness's father, in Nueces cañon, Uvalde county, receiving therefor a check for about fifteen hundred dollars, and an order on the witness for a lot of horses and mules, to be delivered to the defendant at John Camp's, in Wilson county. Witness went to Camp's to deliver the animals, and was there when the defendant was arrested by Caruthers and Shane.

W. S. Hiler testified, for the State, that he was present when the defendant was brought to the place of the homicide. Defendant looked dejected, down-hearted and sorrowful. He was then tied on his horse, and was under arrest. The State rested at this point.

George Brown, the first witness for the defense, testified that

he saw the defendant in company with the deceased about April 1, 1879. They camped, with a wagon and a bunch of horses, for a week or two, near Sam. Johnson's. During this time the defendant made a trip to Nueces cañon. The witness was present at Sam. Johnson's on the morning of April 7, 1879, when the defendant and Swift, with the wagon, horses and mules, came to Sam. Johnson's and asked for a guide to the road leading to Jeff. Johnson's. Johnson directed Danzer to guide the defendant as requested. The defendant at that time stated that the deceased was at the camp, and had lost his mare, and that he, the defendant, had promised to return and assist him in his search for her. Witness was then starting on a cow hunt. As he left, he noticed that Danzer had turned the horses out of the lot, and the wagon, driven by Swift, was on the point of starting in a southeasterly direction. The defendant had started back towards the old camp. The deceased claimed a blue roan mare, shod all around, and always went armed with a six shooter. When the body was found, arms of no kind were found about it.

Robert Richter testified, for the defense, that he lived some twenty-five or thirty miles from Sam. Johnson's, and was acquainted with Bill Danzer. On or about April 10, 1879, Danzer came to witness's house on foot, and told witness that his horse had given out, and that he wanted to make a horse trade. Witness went with Danzer to a point a mile or two distant, and was shown a small blue roan mare, shod all around, which Danzer claimed, stating that he got her from his partner, Bill ———, on the Nueces river. Witness traded with Danzer, giving him a fresh horse for the mare. Danzer also offered to sell a pistol to the witness. When Danzer left he went in a northerly direction, towards Centre Point, in Bandera county. Witness had never seen or heard of him since.

By a number of citizens of Lavaca county, who had known the defendant for periods ranging from ten to twenty-five years, the defendant proved his reputation in that county to have been excellent as a humane, peaceable and quiet man.

The opinion states the testimony of Shane on being recalled, which testimony raised the question principally discussed in the opinion.

The motion for new trial raised the questions treated in the opinion.

*A. P. Bagby,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   Defendant appeals from a third conviction of murder in the second degree, the two former convictions having been set aside upon appeals to this court.   (8 Texas Ct. App., 585; 9 Texas Ct. App., 419.)   As the case is now presented there are but few questions necessary to be considered.

1.   We think there was no error in overruling defendant's application for a continuance.   Such of the facts as were material, which defendant alleged he expected to prove by the absent witness, are shown by the evidence to have been within the knowledge of other accessible witnesses, and it does not appear at all probable that any injury resulted, or could have resulted, to the defendant by the refusal of the court to grant him a continuance.

2.   We find in the record the following bill of exceptions: "Be it remembered that on the trial of the above styled cause, and after the State and defendant had closed their evidence, and the opening arguments for both State and defendant had been made, the State, through her district attorney, asked leave to recall the witness Henry Shane, and to prove the acts of defendant when brought back to the spot where the homicide was committed; to which proceeding the defendant, by counsel, objected, and said objection being overruled by the court, said witness was recalled, and was asked by the district attorney what was said to defendant after he was brought back to said spot where the murder was committed.   Witness replied that he asked the defendant what had been done with the body, to which defendant replied by pointing to the hill where the dead body of deceased had been previously found.   Defendant was under arrest at the time, and had been for two or three days previously.   Said defendant and Swift had been handcuffed together, and part of the time tied with a rope.   Witness had talked with defendant about the murder of deceased, and defendant was informed of what he was under arrest for.   Defendant was not cautioned that his admissions might be used against him.   To all of which proceedings, and to the testimony of said recalled witness, defendant, by counsel, excepted," etc.

It was within the discretion of the court to admit further testimony necessary to a due administration of justice, at any time before the argument of the cause was concluded, and the exercise of such discretion will not be revised by this court unless it

plainly appears to have been abused. (Code Crim. Proc., Art. 661; *Kemp* v. *The State*, 38 Texas, 110; *Bittick* v. *The State*, 40 Texas, 117; *Goins* v. *The State*, 41 Texas, 334; *Moore* v. *The State*, 7 Texas Ct. App., 14; *Hewitt* v. *The State*, 10 Texas Ct. App., 501; *Cook* v. *The State*, 11 Texas Ct. App., 19; *George* v. *The State*, Id., 95; *Bostick* v. *The State*, Id., 126; *Grosse* v. *The State*, Id., 364; *Donahoe* v. *The State*, 12 Texas Ct. App., 297.)

But the question remains, was this evidence admissible at any time? It is very clear that under the circumstances, if the defendant had confessed his guilt, such confession would not have been admissible against him. It was so determined by this court on a former appeal of this case. (*Nolen* v. *The State*, 8 Texas Ct. App., 585.) But does the rule which excludes *confessions* which are not brought within the exceptions of the statute (Code Crim. Proc., Art. 750), also apply to and exclude the *acts* of the defendant done under the same circumstances? This is the question directly presented by the defendant's bill of exception, and is one upon which we find some conflict of opinion. It was the opinion of the learned judge who tried this case, that, while the statements or confessions of defendant made while under arrest were not admissible against him, yet the *acts* performed by him were admissible; and, holding this view, he allowed the prosecution to introduce the evidence objected to by defendant, and set forth in the bill of exception we have quoted. This opinion of the learned judge was no doubt based upon the opinion of this court in *Rhodes* v. *The State*, 11 Texas Court of Appeals, 563, where it is said: "A distinction has always been made between *acts performed* and *confessions made* by a defendant while under arrest. The former are admitted, whilst the latter are not, unless coming strictly within the letter of the statute." In this Rhodes case the defendant was charged with the theft of money and was under arrest, and, while under arrest, she was taken to the house where the stolen money was supposed to be concealed, and there she pulled up a plank in the floor of the house and looked under the floor as if she was looking for the money, but produced nothing. These acts of the defendant were proved by the State over the objections of defendant, and this court held that such evidence was admissible. In support of the doctrine announced in that case the court, in its opinion, cites *Elizabeth* v. *The State*, 27 Texas, 329; *Walker* v. *The State*, 7 Texas Court of Appeals, 245; and *Preston* v. *The State*, 8

Texas Court of Appeals, 30; and the first named case is especially referred to as a case in point.

That case, *Elizabeth* v. *The State*, was a trial for the murder of a child. While the defendant was under arrest she told her guard that she could show the dead body of the child, which at that time had not been discovered; she then walked up a ravine which was close by, and walked into a hole of water, saying that the child was in there, and brought out the dead body of the child. It was held, over the objections of the defendant, that the prosecution might prove the above stated facts. We have no doubt of the correctness of that ruling. We think such testimony was strictly within one of the exceptions of the statute, because it was in consequence of the defendant's acts that the dead body of the murdered child was discovered, and it was upon this ground that the Supreme Court held it to be admissible.

Upon a careful examination and thoughtful consideration of the Elizabeth case, we are of the opinion that it does not support the opinion of this court in the Rhodes case. There is a marked and very material distinction in the two cases. In the Elizabeth case the acts performed by the defendant led to the discovery of the dead body of the child. In the Rhodes case the acts performed by the defendant did *not* lead to the discovery of the stolen money. We will refer to this distinction more fully in a subsequent portion of this opinion.

*Walker* v. *The State*, cited as supporting the Rhodes decision, is, we think, essentially different from the Rhodes case, and does not support it. While under arrest upon a charge of murder, and during an examining trial upon the charge before a justice of the peace, the defendant Walker was caused by the magistrate to make tracks in the ashes and sand, and a measure was applied to these tracks which fitted exactly, and this measure was of tracks found at the place of the murder. These facts were proved over the objections of defendant upon his trial after indictment; to which he objected, and upon appeal, this court held the evidence was admissible, quoting at length from the opinion in *The State* v. *Graham*, 74 N. C., 646, where the identical question was presented and determined, and a portion of which opinion we here quote: "The object of all evidence is to elicit the truth. Confessions which are not voluntary, but are made either under the fear of punishment if they are not made, or in the hope of escaping punishment if they are made,

Hi1

are not received as evidence, because experience shows that they are liable to be influenced by those motives, and cannot be relied on as guides to the truth. But this objection will not apply to evidence of the sort before us. No fears or hopes of the prisoner could produce the resemblance of his track. This resemblance was a fact calculated to aid the jury, and fit for their consideration."

It will be perceived from the foregoing extract that the admissibility of the testimony as to the tracks was founded upon the reason that no hopes or fears of the prisoner could produce a resemblance of his tracks, while confessions are excluded because experience shows they are liable to be influenced by such motives, and are therefore not always truthful.

In the Preston case (*supra*) we find nothing in support of the broad doctrine laid down in the Rhodes case, that the *acts* of the defendant are never to be treated as confessions so as to render them inadmissible in evidence, but that such *acts* are admissible under circumstances which would exclude confessions. We have found no authority which in our judgment upholds the doctrine of the Rhodes case to the extent that it seems to reach.

Mr. Wharton says that "confessions may be by *acts* as well as *words*" (Whart. Cr. Ev., sec. 683); and even silence, under certain circumstances, is taken as a confession. (Id., sec. 679.) Suppose a prisoner charged with murder is asked the question "Are you guilty of murder?" and instead of saying "I am" he makes an affirmative movement of his head. Would this movement of the head be admissible evidence, while his confession by words would be inadmissible? Suppose he were told, "You murdered the deceased; you crushed in his head with an axe; you dragged him into yonder thicket and left him, after having robbed him," and in response to this charge the prisoner had not uttered a word, but had nodded his head in assent to the truth of the same; will it be contended that the *act* of nodding his head, because it is an *act* and not a statement or declaration, is competent evidence against him, when if he had confessed the charge by *words* such confession would have been excluded? We are unable to perceive the reason of the rule which admits the *acts* while it excludes the *words*. *Acts*, it is said, speak louder than *words*, and this being generally true, they should be regarded as confessions, as much so as words, and the law does so regard them. *Acts* are but a kind of language, expressing the emotions and thoughts of the person performing them, more

forcibly and convincing sometimes than words, but still, like words, only a medium through which the inward feelings, thoughts or intents of the person are outwardly indicated.

In the case before us, the prisoner pointed in the direction of where the body of deceased had been found, when asked what they had done with deceased. Instead of this response to the question, suppose he had said: "We left the dead body of deceased on yonder hillside." Would this answer have been admissible? We think not under the long line of decisions in this State. How, then, can it be said that his gesture is competent evidence? Upon what principle is this distinction founded? Can a confession be indirectly admissible which would not be directly so? Would not such a construction of the law defeat its purposes? Would it not probably lead to great evils? Under such a rule, extorted confessions of guilt, made by nods, winks, gestures, and other *acts* would be frequently paraded in cases to supply the absence of sufficient evidence to establish the guilt of the accused. Such evidence would be easily attainable in most cases, and would be as unreliable and objectionable in every respect as confessions by words. As said by Roscoe and Greenleaf: "The influence which might produce a groundless confession might also produce groundless conduct." (Rosc. Cr. Ev., 51; 1 Greenl. Ev., sec. 232.) In this case, for illustration, the same influences which might have prompted the defendant to confess by words that he had committed the murder might have also prompted him to point in the direction of where the dead body of the murdered man had been found. Both the above quoted standard authors lay down the rule that the *acts* of the prisoner are in such cases placed upon the same plane with his *words*, and where the one is inadmissible so also is the other.

We are of the opinion that the rule announced in the Rhodes case is in conflict with the authorities and with the reasons which support the law governing the admissibility of confessions, and we must therefore overrule that case upon this subject.

3. Another serious question here presents itself. It appears that the defendant pointed in the direction of where the body of the deceased had been found. It was not in consequence of anything said or done by the defendant that the dead body was discovered, or that any fact connected with the homicide was discovered. A confession is admissible against a defendant

when he makes statements of facts or of circumstances that are found to be true, which conduce to establish his guilt; such as the finding of secreted or stolen property, or instrument with which he states the offense was committed. (Code Crim. Proc., Art. 750.) Does this mean facts or circumstances which have, prior to and independent of the confession, been found to be true, or is it confined to such facts or circumstances as are, in consequence of and by means of the information afforded by the confession, found to be true?

Upon this question we find the authorities uniform. Mr. Green-leaf states the rule in the following language: "Where, *in consequence of the information obtained from the prisoner,* the property stolen, or the instrument of the crime, or the bloody clothes of the person murdered, *or any other material fact is discovered,* it is competent to show that such *discovery* was made conformably to the information given by the prisoner." (1 Greenl. Ev., sec. 231.) Mr. Phillips states the rule in substantially the same words. (1 Phil. Ev., 554.) Mr. Roscoe says: "Although a confession obtained by means of promises or threats cannot be received, yet, *if in consequence* of that confession certain facts tending to establish the guilt of the prisoner are made known, evidence of those facts may be received." (Rosc. Cr. Ev., 50.) Mr. Bishop announces the same doctrine. (1 Bish. Cr. Proc., sec. 1242.) Mr. Wharton says: "Although confessions made by threats or promises are not evidence, yet if they are attended by extraneous facts which show that they are true, any such facts which may be thus developed, and which go to prove the existence of the crime of which the defendant was suspected, will be received as testimony; *e. g.* where the party thus confessing points out or tells where the stolen property is, or where he states where the deceased was buried, or gives a clue to other evidence which proves the case. But if, in consequence of the confession of the prisoner thus improperly drawn out, the search for the property or person in question proves ineffectual, no proof of confession or search will be received." (Whart. Cr. Ev., sec. 678.)

We believe it will be found upon examination that the decisions of the courts of this State have uniformly been in accord with the rule as stated by the elementary authors we have cited. We have found no case in which a contrary doctrine has been adopted. In *Massey v. The State,* 10 Texas Court of Appeals, 645, this court said: "Confessions made under arrest, unless vol-

untary and after warning, may be used to the extent that the party made statement of facts and circumstances found to be true, and no further. Beyond the facts stated, and as far as they furnish information, other portions of the confession would not be admissible." In *Davis* v. *The State*, 8 Texas Court of Appeals, 510, the doctrine we have quoted from the text books is fully and plainly approved and adopted.

We hold it to be settled, then, that the statement of facts or circumstances which are already known to exist, and which statement does not lead to any information connecting or tending to connect the defendant with the crime, will not be admissible in evidence against the defendant, if made while under arrest, unless it is made admissible under some other exception in the statute.

Applying the rules we have discussed to the evidence of defendant's act in pointing in the direction of where the body of deceased had been previously found, we are of the opinion that it was not competent evidence, because it was a confession by act of a knowledge of facts, which knowledge tended to connect defendant with the murder, and was made while he was under arrest, without his being first cautioned that it might be used against him, and without being accompanied by a statement of any fact or circumstance found to be true which conduced to establish his guilt. While the learned judge who tried the case was fully authorized by the opinion of this court in the Rhodes case in admitting this evidence, we must now hold this court was mistaken in the rule laid down in that case, and that the admission of the testimony was error, for which the judgment must be reversed.

4. But, even if this evidence had been competent, we do not think we could have approved the verdict and judgment upon the evidence as presented in the statement of facts. While the circumstances pointing to the defendant's guilt are cogent, and render it quite probable that he participated in the murder, they do not impress us with that force and conclusiveness which should produce upon the mind a moral certainty of his guilt, to the exclusion of every other reasonable hypothesis. These same circumstances point to the man Danzer even more directly and more strongly as the murderer, than they do to this defendant. But it is not necessary or perhaps altogether proper that we should discuss the evidence. Upon another trial of the case, the

prosecution may be able to adduce testimony more satisfactory, and amply sufficient to support a conviction.

Because the court erred in admitting the evidence complained of in defendant's bill of exception hereinbefore quoted, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 23, 1883.